IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY CHARLES PARLE, | No. C 01-3487 WHA |
| Petitioner, | |
| v. | **ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS** |
| DAVID L. RUNNELS, Warden, High Desert State Prison, | |
| Respondent. | |

## INTRODUCTION

In this habeas case, the question presented is whether the state appeals court reached a decision that was objectively unreasonable, in light of United States Supreme Court holdings, when it decided that five conceded evidentiary errors did not collectively deprive petitioner of a fair trial. This order holds that the its decision was objectively unreasonable. The petition for a writ of habeas corpus is therefore **GRANTED**.

## STATEMENT

The facts of petitioner Timothy Charles Parle's trial and conviction for first-degree murder of his wife were recited exhaustively in a prior order (Order Granting Pet. For Writ 2–17 (Aug. 27, 2002)). In brief, petitioner does not protest his innocence. He concedes that he unlawfully killed his wife, Mary Parle. The only real dispute at trial was petitioner's state of mind. The jury found him guilty of first-degree murder. Petitioner contends he was guilty of no

1 more than second-degree murder or voluntary manslaughter, a killing done in a heat of passion
2 or in a sudden quarrel.

3      On direct review, the state Court of Appeal upheld petitioner's conviction (Answer, Exh.
4 E (*People v. Parle*, No. H017348, slip op. (Cal. Ct. App. 2000) (unpublished)).  That court held
5 that the trial court had committed the following errors:

- The trial court violated petitioner's psychotherapist-patient privilege by holding that the privilege had been waived and requiring petitioner's psychiatrist to testify against him (*id.* at 27).
- The trial court improperly refused to allow a rebuttal psychiatrist, an expert for the defense, to testify about the effects of a manic episode (*id.* 31).
- The trial court should have admitted certain evidence of Mary's character for violence and her recent threats to petitioner (*id.* at 56).
- The trial court should have admitted earlier testimony of petitioner's father (deceased by the time of trial) relating to petitioner's mental condition on the night of the homicide (*ibid.*).
- The trial court should have excluded evidence of petitioner's threats to a police officer five years before the homicide because it was impermissible character evidence (*id.* at 53, 55).

20      The state Court of Appeal held, however, that all of these errors were harmless, even
21 when viewed collectively.  It held that although some evidence of Mary's character for violence
22 and threats against petitioner was improperly excluded, there was "ample evidence" on these
23 issues before the jury, including evidence — mostly petitioner's statements — that Mary had
24 used a hammer, a pot, a letter opener, a knife, a brick and a firearm to strike or threaten
25 petitioner.  The state court also pointed to evidence that Mary had threatened to kill petitioner,
26 said she was "going home to fight" just hours before her death and had suffered mental problems
27 that necessitated involuntary commitment.  The court held that, in light of this evidence, the
28 improperly excluded evidence would have been merely cumulative.  The state court also held

that, although the trial court improperly had admitted evidence of petitioner's threat against the police officer, it was cumulative of other evidence of petitioner's violent behavior, including threats to kill Mary, her friends, his son and his stepson. The state court similarly held that it had not been prejudicial to bar the defense expert's testimony on manic disorders because the jury had heard evidence that petitioner was suffering stress and agitation and was babbling on the night of the homicide (*id.* at 56–57). The state court's conclusion that there was no cumulative error marks the point of respectful departure by undersigned.

This Court initially granted a writ of habeas corpus in this action on the ground that admission of the victim's diary into evidence violated the Confrontation Clause. Another ground was that admission of the diary, when combined with other errors, collectively deprived petitioner of due process of law. The Ninth Circuit reversed on the Confrontation Clause issue, vacated the judgment and remanded the case with instructions to reconsider the cumulative-error issue, treating the diary as admissible. *Parle v. Runnels*, 387 F.3d 1030, 1045–46 (9th Cir. 2003).

On remand, this Court held that the state appellate court had erred by performing its cumulative-error analysis under the wrong standard. In addition, this Court held that it was questionable whether the state court had assessed cumulative impact at all, since its decision appeared to discuss the errors one by one, rather than by gauging their collective impact. Because of these apparent mistakes, this Court applied *de novo* review and held that the state court should have found that the errors collectively violated due process. The petition was granted and judgment entered in petitioner's favor (Order Granting Pet. For Writ of Habeas Corpus 2, 9–10; Judgment (July 11, 2005)). The Ninth Circuit, however, vacated the judgment. It held that this Court's cumulative-error review should not have been *de novo* and remanded the case "to determine whether the decision of the state court was an objectively unreasonable application of *Chambers v. Mississippi*, 410 U.S. 284 (1973), *Taylor v. Kentucky*, 436 U.S. 478 (1978), or other relevant Supreme Court precedent." *Parle v. Runnels*, No. 05-16610, mem. at 2 (9th Cir. Apr. 27, 2006) (unpublished). Petitioner and respondent David L. Runnels each

submitted two briefs after remand. This order now addresses the question posed by the Ninth Circuit.

**ANALYSIS**

A person in custody pursuant to a state judgment may be granted a writ of habeas corpus if he or she is being held in violation of the Constitution, laws or a treaty of the United States. A federal court can grant such a writ as to a claim adjudicated on the merits in state court only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts . . . ." 28 U.S.C. 2254(d). A decision is an "unreasonable application" if it applies the proper governing rule to a new set of facts but comes up with an objectively unreasonable result, or if it extends or fails to extend a legal principle established by a Supreme Court holding in a way that is objectively unreasonable. *Williams v. Taylor*, 529 U.S. 362, 405–12 (2000).

To decide a claim, a federal court must "first decide what constitutes clearly established federal law, as determined by the Supreme Court" at the time of the state court's decision. The court considering the petition then must assess whether the state court's determination was contrary to that law or involved an unreasonable application of it. *Lockyer v. Andrade*, 538 U.S. 63, 71–73 (2003).

**1.    CUMULATIVE ERROR.**

The Supreme Court has held that a state court can violate due process through the combined effect of multiple erroneous rulings. *See Chambers*, 410 U.S. at 290, n.3 & 298, *Taylor*, 436 U.S. at 487–88 & n.15. Significantly, such cumulative error can be found even if no single mistake rises to the level of an independent constitutional violation. *Chambers*, 410 U.S. at 290, n.3 & 298. To warrant relief, the flaws cumulatively must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). An error so taints a jury verdict when it has a "substantial and injurious effect or influence" on the result. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Relief is also required when the reviewing judge has such "grave doubt" about

the harmlessness of the error that "he feels himself in virtual equipoise" on that issue. *O'Neal v. McAninch*, 513 U.S. 432, 434–35 (1995).

In considering the combined harmfulness of the five conceded errors here, we must keep in mind that the sole disputed issue at trial was petitioner's state of mind. To convict petitioner of first-degree murder, the jury had to find beyond a reasonable doubt that the killing was "willful, deliberate, and premeditated." Cal. Penal Code § 189. If the state could not prove these circumstances, petitioner would be guilty of second-degree murder. If the state could not prove that petitioner acted with malice, but instead acted "upon a sudden quarrel or heat of passion" petitioner could have been convicted of no more than voluntary manslaughter. *Id.* at § 192(a). Respondent conceded before the state Court of Appeal that there was enough evidence of the voluntary manslaughter and second-degree murder to justify convicting petitioner of one of them rather than first-degree murder, stating that "the jury had plenty of evidence before it from which it could have concluded, had it wished, that [petitioner] killed Mary during a . . . heat of passion or sudden quarrel . . . and not out of premeditation or deliberation" (Answer, Exh. D (Resp't's Br. 132, *Parle*, No. H017348)).

**2.   UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW.**

*Chambers v. Mississippi* was the first cumulative-error decision by the Supreme Court. The case arose when a police officer was shot and killed. Moments after being hit, the officer appeared to fire his gun directly at Leon Chambers, striking him in the head and neck. The prosecutor accused Chambers of shooting the officer and charged him with murder. Chambers pleaded not guilty, asserting that he had not fired any shots. 410 U.S. at 285–87.

Gable McDonald, who helped take Chambers to the hospital, later gave a sworn confession that he (McDonald) had shot the officer and that he already had said as much to a friend. McDonald said that he used his own gun, which he later had discarded. He said that his confession was voluntary and not compelled. The confession was transcribed, signed and witnessed. *Id.* at 287–88.

A month later, McDonald repudiated his confession in a court appearance. McDonald claimed that he had lied as part of an agreement with another local man (not Chambers) to share

5

in the proceeds of a tort case that would be brought against the town government. McDonald told a judge that he had been assured by the third man that he would not be prosecuted. *Id.* at 288.

At trial, Chambers's defense was that he had not shot the officer and that instead McDonald had killed him. Chambers was thwarted, however, in presenting certain evidence to prove that theory. Chambers called McDonald as a witness, laid a foundation, and had his out-of-court confession read to the jury. The prosecutors cross-examined McDonald, eliciting a repudiation of the confession. The state court then held that Chambers had no right to cross-examine McDonald, based on a state law that barred a party from cross-examining one of his own witnesses unless that witness specifically implicated the defendant in the crime. McDonald had not accused Chambers. The state court therefore ruled that Chambers had no right to treat McDonald as hostile. *Id.* at 288–89, 291–92.

To make matters worse, the trial court also prevented Chambers from introducing testimony of three witnesses who said McDonald had admitted to them that he shot the officer. All of the testimony was held to be hearsay and therefore excluded. One witness testified that McDonald confessed to the shooting on the night of the incident. The trial judge, however, told the jury to disregard the testimony. Another witness would have testified that McDonald confessed as they took Chambers to the hospital and reminded the witness of his confession later, advising him not "mess him up." The third witness would have testified that, the day after the killing, McDonald confessed and told him he had discarded the murder weapon. *Id.* at 292–93.

Chambers was able to introduce certain testimony that impeached McDonald. "But all that remained from McDonald's own testimony was a single written confession countered by an arguably acceptable renunciation. Chambers' defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the other [oral] confessions been admitted." The United States Supreme Court held that Chambers's right to due process of law was violated by the collective impact of not being able to cross-examine McDonald and of not being able to present testimony implicating McDonald in

6

1  the shooting: "We need not decide . . . whether this error [preventing cross-examination] alone
2  would occasion reversal since Chambers' claimed denial of due process rests on the ultimate
3  impact of that error *when viewed in conjunction* with the trial court's refusal to permit him to call
4  other witnesses. . . . We conclude that the exclusion of this critical evidence, *coupled with* the
5  State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with
6  traditional and fundamental standards of due process." *Id.* at 294–95, 298, 302–03 (emphasis
7  added). Note well that the excluded evidence was, as here, cumulative of other evidence heard
8  by the jury.

9        In *Taylor v. Kentucky*, the defendant, Michael Taylor, was tried for robbery. The
10 prosecutor read the indictment to the jury. He suggested in his closing argument that Taylor's
11 status as a defendant should be considered against him as the jury decided whether he was guilty.
12 The prosecutor did so by stating that Taylor, "like every other defendant who's ever been tried
13 who's in the penitentiary or in the reformatory today, has this presumption of innocence until
14 proven guilty beyond a reasonable doubt," and by saying that "[o]ne of the first things
15 defendants do after they rip someone off, they get rid of the evidence as fast and as quickly as
16 they can." The trial judge denied Taylor's request for jury instructions that "[t]he law presumes
17 a defendant to be innocent of a crime" and that the indictment was not evidence. The
18 instructions themselves were "skeletal." The Supreme Court held that "the *cumulative effect* of
19 the potentially damaging circumstances of this case violated the due process guarantee of
20 fundamental fairness in the absence of an instruction as to the presumption of innocence . . . ."
21 *Taylor*, 436 U.S. at 479–81, 486–88 & n.15 (emphasis added).

22       The state Court of Appeal decision in the instant case was *not* an unreasonable
23 application of *Taylor*. The result in *Taylor* turned on the impact of several "potentially
24 damaging circumstances" *in light of* "the absence of an instruction as to the presumption of
25 innocence . . . ." 436 U.S. at 487, n.15. The holding turned on the absence of the presumption-
26 of-innocence instruction. Here, petitioner does not contend that the judge failed to instruct the
27 jury on the presumption of innocence. *Taylor* is therefore inapposite.

28

7

The state court's decision in this case was, however, an unreasonable application of *Chambers*. The errors in *Chambers* resembled the mistakes made by the trial court in the instant case. The collective effect of the trial-court errors here was as damaging as those in *Chambers*, if not more so. In *Chambers*, that impact required reversal of the conviction. The state Court of Appeal, however, concluded here that there was no need to reverse the conviction. That decision was objectively unreasonable under *Chambers*. Put another way, the state Court of Appeal decision was unreasonable when it failed to extend the legal principles of *Chambers* to the facts of the instant case. *See Williams*, 529 U.S. at 407, 409. The excluded evidence on the effects of a manic episode, on the victim's threats and violent tendencies, and on petitioner's mental state just after the killing was highly probative of the central issue at trial — petitioner's state of mind. In addition, this excluded evidence would have materially strengthened the credibility of petitioner, who testified at the trial. Conversely, the improperly admitted evidence was materially harmful on the same issues.

To explain these conclusions, this order now examines the individual effects of the trial errors and the prejudice they caused collectively.

### A. Medical Testimony.

The prosecution called petitioner's psychiatrist, Dr. Antoinette Acenas, to testify. Petitioner objected on the grounds that her testimony would violate his psychotherapist-patient privilege. All concede that the trial court improperly overruled the objection. The psychotherapist was then forced to testify against her own patient. The prosecutor extracted testimony that petitioner had revealed to her, in the year before the homicide, "thoughts of hurting others" and that petitioner was "ready to explode at his wife." Dr. Acenas also testified that petitioner at the time of the stabbing did *not* demonstrate manic symptoms and that, a week before the incident, he appeared to be doing well on his medication (Reporter's Tr. 654, 673, 696). This was powerful testimony against the defense on the main issue in the case — state of mind.

The state Court of Appeal held, as stated, that the trial court violated petitioner's psychotherapist-patient privilege by forcing Dr. Acenas to testify for the prosecution during its

8

1  case-in-chief (*Parle*, No. H017348, slip op. at 27). The state conceded that this violation had to
2  be reviewed under the "harmless beyond a reasonable doubt" standard of *Chapman v. California*,
3  386 U.S. 18, 24 (1967), because the privilege was part of petitioner's federal, constitutional right
4  to privacy. Nevertheless, the state Court of Appeal found that Dr. Acenas's testimony had no
5  effect on the outcome of the trial because most of her testimony was supposedly cumulative of
6  other evidence. For example, the state court held that the jury already knew that petitioner was
7  seeing a psychiatrist and that he and Mary were having marital problems (*Parle*, No. H017348,
8  slip op. at 32). This, however, was a far cry from the force of the medical testimony compelled
9  in violation of the privilege.

10  Petitioner requested permission to call a defense expert witness, psychiatrist Jay
11  Jackman, to counter the damage inflicted by Dr. Acenas's testimony. This was allowed — but
12  only in part. Before the jury, Dr. Jackman testified that he had reviewed petitioner's medical
13  records and the videotape of petitioner's interview with the police. Dr. Jackman testified that in
14  his opinion, petitioner suffered from severe bipolar disorder and that petitioner appeared to have
15  been suffering from a manic episode the night of the stabbing.

16  In a sidebar, petitioner's counsel proposed to ask Dr. Jackman the following questions
17  (RT 1954–59) (emphasis added): (1) How would a manic episode come to play in terms of a
18  domestic dispute and in particular an argument that was violent? (2) How would a manic episode
19  reflect on one's behavior with one's spouse? (3) Whether a person with bipolar disorder would
20  feel more pressure and agitation during an argument? (4) Would it be more or less likely that a
21  person would carefully weigh and consider the consequences during an altercation if under the
22  influence of a manic episode? (5) Is clarity of thought indicative of a manic episode? and (6)
23  How does a manic state affect a person's thought process? Defense counsel made an offer of
24  proof that the "doctor's opinion [was] that [a manic episode] *does* affect a person's ability to
25  premeditate, that a person is pressured and agitated during a manic state and less able to
26  premeditate." The prosecutor's objection to these inquiries was sustained.

27  Before the jury, Dr. Jackman managed to testify to certain points. The judge, however,
28  struck that evidence. Specifically, he struck Dr. Jackman's statements that bipolar disorder is

9

characterized by impulsiveness and poor judgment, and that a person does not stop to consider consequences or alternatives during a manic episode (*id.* at 2002–04).

The state Court of Appeal held that these rulings were erroneous: "[t]he majority of the questions defendant proposed to ask Dr. Jackman should have been permitted. Most of the questions were designed to elicit testimony that was relevant to the question whether defendant actually had the mental state required for a first degree murder conviction." Nevertheless, the state Court of Appeal held the error harmless because petitioner "was permitted to present some expert testimony about his mental disorder," including Dr. Jackman's opinion that a manic episode could cause a person to become stressed, agitated and violent (*Parle*, No. H017348, slip op. at 31, 37). The supposed proxy, however, was a thin substitute for the evidence wrongfully excluded.

The compelled violation of the privilege was devastating to petitioner's theory of defense. Dr. Acenas's testimony was that petitioner did not exhibit manic behavior and that his mental disorder was under control. She even revealed petitioner's private, confidential statements that he had thought of killing Mary. To mitigate this severe violation of the privilege, defense counsel called Dr. Jackman. The trial court, however, refused to allow him to testify that, at the time of the killing, a manic episode was affecting petitioner's ability to premeditate. The prejudicial effect of the exclusion was highlighted in the closing argument. Defense counsel attempted to make his argument about the effects of the manic episode but was shut down (RT 3581–82) (emphasis added):

> Defense Counsel: So what is the point of bringing this psychiatric information to your attention? We're not trying to tell you that Chuck was not guilty by reason of insanity, that he didn't know what he was doing at the time of Mary's death. This is not that type of case.
>
> *What we're saying is that it's very possible that Chuck was suffering from a manic episode at the time of Mary's death and that he was less likely to carefully consider his actions and less able to deal with the antagonism that was inherent in the relationship, apt to be more rash, more impulsive as a result of this disorder, less able to exercise good judgment.*

10

| | | |
|---|---|---|
| 1 | Prosecutor: | Objection. |
| 2 | The Court: | Sustained. |
| 3 | Prosecutor: | Move to ask the Court to instruct the jury that there was no evidence to support the last two or three assertions. |
| 4 | | |
| 5 | The Court: | Ladies and gentlemen of the jury, I'm going to instruct you as follows: The Court will be the final arbitrator in terms of the law that applies to this case and how you're to apply that law to the facts. Arguments of counsel, whether it be the prosecution or the defense, are merely argument and not evidence. |
| 6 | | |
| 7 | | |
| 8 | | |

Then, in his rebuttal, the prosecutor explained his objection to the jury, thus revealing the crippling effect of the exclusion of Dr. Jackman's testimony (RT 3636) (emphasis added):

| | | |
|---|---|---|
| 11 | Prosecutor: | There was a point that I objected during his argument, that was the second time, and the reason I objected is that there's no evidence in this case that bipolar disorder has an impact on one's ability to premeditate or deliberate. I'm sure that's what he would like you to believe. |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | You could throw off a witness talking about bipolar disorder and come in here and say that you'll do an instruction that says you may consider bipolar disorder in connection with the ability to deliberate. |
| 16 | | |
| 17 | | \*       \*       \* |
| 18 | | *The evidence is that bipolar disorder has not been testified to as diminishing a person's ability to premeditate or deliberate at all.* |
| 19 | | |

An accused is entitled to put on his defense. *California v. Trombetta*, 467 U.S. 479, 485 (1984). Petitioner's defense was that he was in a manic state and was incapable of forming the requisite intent for first-degree murder. Dr. Jackman's testimony went to the heart of this defense and was highly probative on the central issue at trial. His testimony carried special weight because he was an expert. But the evidence was wrongly excluded — the state appeals court so conceded. That court, however, decided that because Dr. Jackman did testify that a manic episode may cause stress, agitation and violence, exclusion of the more decisive evidence was not prejudicial.

11

This order respectfully disagrees. The excluded evidence was *not* cumulative. A person can premeditate even when he is stressed and agitated. Evidence that petitioner was stressed and agitated therefore did little to negate premeditation. A manic episode, however, is *inconsistent* with premeditation, or so the jurors could have reasonably concluded had they heard the excluded testimony. If petitioner had been allowed to show that he was suffering a manic episode that impaired his ability to premeditate, he would have been substantially better equipped to rebut the charge of first-degree murder. This prejudice was magnified by the prejudice flowing from forcing his own doctor to testify that petitioner's disorders apparently had been under control.

The conceded errors in the instant case share crucial characteristics in common with the exclusion of evidence in *Chambers*. In that case, the excluded evidence went to the heart of the central issue in the case — whether Chambers or McDonald was the shooter. Here, the wrongfully excluded and wrongfully admitted evidence also went to the key dispute — whether petitioner killed Mary willfully, deliberately and with premeditation, or was guilty of some lesser homicide.

Even if the evidence *had* been cumulative, that would not reconcile the state court's decision with *Chambers*, for the wrongfully excluded evidence in *Chambers* also was cumulative. There, the defendant introduced McDonald's written confession to killing the police officer. McDonald then impeached himself by testifying that the earlier confession was a lie. Other defense witnesses further impeached McDonald by contradicting key elements of his testimony. *All of this was cumulative of the excluded evidence in the same sense used by the state appeals court here*. If the attorneys for the defendant in *Chambers* had been allowed to cross-examine McDonald, they might have been able to impeach him further. Such added impeachment would have been cumulative of the other impeachment evidence. Furthermore, the three witnesses' excluded testimony about McDonald's oral confessions was "merely cumulative" of the written confession. The cumulative nature of the evidence excluded in *Chambers* was no bar to finding that, in the aggregate, its absence rendered the trial fundamentally unfair.

12

1    The mere fact that an item of wrongfully excluded or wrongfully admitted evidence is
2 cumulative of other evidence does not prevent it from undermining the verdict. The state Court
3 of Appeal, however, erroneously held to the contrary. That finding anchored the court's decision
4 that the collective impact of the errors was harmless and that the conviction was valid.

> Defendant contends that the errors in this case require reversal because even if harmless in isolation, they are prejudicial when considered together. We disagree. Most of the errors involved the erroneous admission or exclusion of evidence. However, the evidence in question was essentially cumulative of evidence that was properly admitted

(*Parle*, No. H017348, slip op. at 56).

In basing its decision on this erroneous view of cumulative evidence, the state Court of Appeal unreasonably applied at least two more holdings of the Supreme Court. The Supreme Court has held that even if erroneously admitted evidence is cumulative, reviewing courts must consider whether it may have tipped the verdict against the accused by altering the balance of evidence on a contested issue. If the wrongfully admitted evidence might have affected the verdict, the result must be overturned. *Krulewitch v. United States*, 336 U.S. 440, 442–45 (1949); *Hawkins v. United States*, 358 U.S. 74, 74–75, 79–80 (1958).

In *Krulewitch v. United States*, the trial court erroneously admitted hearsay that the defendant was guilty of the crime charged. The government argued that the admission of the statement should not upset the verdict because it "was merely cumulative evidence . . . ." The Supreme Court held that there nevertheless was grave doubt as to whether the error was harmless, and therefore reversed the conviction. *Krulewitch*, 336 U.S. at 442–45.[1]

The issue also came up in *Hawkins v. United States*, which reversed a man's conviction for "transporting a girl from Arkansas to Oklahoma for immoral purposes." The district court erred by allowing the government to use the defendant's wife as a witness against him. The

---

[1] *See also United States v. Price*, 577 F.2d 1356, 1363 (9th Cir. 1978) ("We do not suggest that, if evidence bearing on all the ingredients of the crime is tendered, the use of cumulative evidence, though tainted, is harmless error."); *Bailey v. Rae*, 339 F.3d 1107, 1119 (9th Cir. 2003) ("The state court's analysis of prejudice amounted to little more than a blanket assumption that, because Ford's reports were cumulative, they would have had little impact on the trial's outcome. . . . [W]e conclude that the Supreme Court's *Brady* jurisprudence requires more than simply labeling the evidence as cumulative without placing it in context.").

13

1  wife's testimony supported the government on "the only factual issue in the case . . . ." As in
2  *Krulewitch*, the government urged the Supreme Court to find that the error was harmless. The
3  court declined to do so: "we cannot be sure that her evidence, though in part cumulative, did not
4  tip the scales against petitioner on the close and vital issue of whether his prime motivation in
5  making the interstate trip was immoral." 358 U.S. at 74–75, 79–80.[2]

6  In the instant case, the jury faced just such a "close and vital issue" — petitioner's state
7  of mind. *See id.* at 80. The instant case had another important parallel with *Hawkins*: key
8  evidence came in against the defendants in both cases due to the violation of a privilege. In
9  *Hawkins*, it was a marital privilege. In the instant case, it was the psychotherapist-patient
10 privilege. Despite these similarities, the state Court of Appeal held that the cumulative nature of
11 the wrongfully admitted and wrongfully excluded evidence here was enough to render any harm
12 innocuous. That decision unreasonably applied the holdings of *Krulewitch* and *Hawkins*. Both
13 of those decisions involved the improper *admission* of *prosecution* evidence. It nevertheless also
14 was unreasonable of the state Court of Appeal not to apply the principles of those decisions to
15 the improper *exclusion* of *defense* evidence, which can have the same effect as wrongly
16 admitting prosecution evidence.

17 The state court's treatment of supposedly cumulative evidence here also was an
18 unreasonable application of *Chambers*. The state Court of Appeal should have held that the
19 cumulative nature of the evidence did not render the collective error harmless, just as the
20 exclusion of similarly cumulative evidence had not been harmless in *Chambers*. In both cases,
21 as in *Krulewitch* and *Hawkins*, the collective impact of the errors decisively tipped the evidence
22 against the accused on the key dispute at trial. Reason cannot reconcile the two courts'
23 conflicting conclusions. The state Court of Appeal's decision therefore was an objectively
24 unreasonable application of *Chambers*, *Krulewitch* and *Hawkins*.

---

[2] *Trammel v. United States*, 445 U.S. 40, 53 (1980), modified the marital privilege but did not affect *Hawkins*'s holding that the cumulative nature of erroneously admitted testimony does not render it automatically harmless.

14

### B.     The Deceased Father's Preserved Testimony.

The state Court of Appeal also found that the trial court erred by excluding portions of a transcript of the conditional examination of petitioner's father, Richard Parle, who died before the trial and whose testimony had been preserved. The proffer pertained to petitioner's mental condition on the night of the homicide. His father had testified that petitioner had shown "a great deal of fear" when he called his parents shortly before the stabbing. That testimony, however, was excluded. Also kept from the jury was Richard Parle's testimony about petitioner's demeanor when the father arrived at the scene immediately after the stabbing (RT 342, 350, 352, 369–70). Specifically, when the father touched petitioner, "there was no recognition" and "[his son] did not even really know it was [him] standing next to him." The state Court of Appeal held that these exclusions were error. Nevertheless, that court ruled that they were harmless in light of other evidence before the jury that petitioner was babbling, making no sense and appeared agitated immediately after the stabbing (*Parle*, No. H017348, slip op. at 44).

The exclusion of his father's testimony was another instance of petitioner being prevented from calling a witness whose testimony would have supported his state-of-mind defense. Evidence that petitioner felt "a great deal of fear" tended to support his defense that he stabbed Mary in a moment when he was overcome by emotion, rather than after deliberate premeditation. The evidence that petitioner did not recognize his own father soon after the homicide also supported his contention that he was not thinking clearly and was suffering from a manic episode. Of course, the jury might (or might not) have attached some bias to Richard Parle, since he was a parent. But the proximity in time of the father's observations — the fact that he made his observations while speaking with his son right before and after the incident — made the evidence particularly relevant.

A good argument can be made that this testimony was not cumulative. His own father's testimony that petitioner "didn't even know really it was [him] standing" at his side was unlike the other, admitted testimony that petitioner was "babbling, making no sense and appeared agitated." While the latter testimony describes readily observable behavior, the excluded

15

1  testimony would have provided a unique window into what that behavior meant, coming from
2  someone who knew petitioner well.  Even if cumulative, *Chambers*, *Krulewitch* and *Hawkins*
3  teach that this fact alone does not necessarily render the error harmless.  Again, an accused is
4  entitled to present *all* defense points that could tip the balance in his favor, not simply a
5  representative sample.  The father's observations were not repetitive of the babbling/agitated
6  comment.

### C. Evidence of Mary's Character for Violence.

The defense sought to introduce evidence that Mary told a nurse, a prosecution witness, that Mary wanted to kill petitioner.  She made the statement while committed to a psychiatric ward thirteen days before the homicide.  On direct examination by the prosecutor, the nurse was allowed to testify that, when petitioner was present, Mary "appeared to cower and to be childlike and soft spoken."  On cross-examination, defense counsel elicited from the nurse that Mary seemed "angry" at petitioner.  The trial court, however, excluded further questioning as to what the nurse meant by that — even after defense counsel provided an offer of proof, explaining that the nurse's own notes stated that Mary had expressed "vindictiveness" toward petitioner and that Mary had said "I'd like to hurt him and I want to kill him" (RT 2257–61, 2264).  Mary's statements — made less than two weeks before her death — were never heard by the jury.

The state Court of Appeal held that the trial judge's refusal to allow the nurse to recount Mary's statements was indeed error, concluding "statements of Mary's desire to hurt petitioner were relevant to show her character for violence and to support defendant's credibility.  Even if defendant was unaware of the statements, they were relevant to support defendant's assertion that Mary acted violently toward him on the night of the homicide."  Yet, here again, the state court held that the error was harmless because there was other evidence that, during numerous arguments, Mary had been aggressive and violent toward petitioner (*Parle*, No. H017348, slip op. at 41–42).

The trial court also sustained numerous hearsay objections by the prosecutor to questioning designed to elicit evidence that Mary had threatened petitioner.  For example, the trial court granted a motion to strike petitioner's testimony that Mary had called him four days

16

1 before the incident and threatened to kill him and their son. Also, defense counsel indicated that
2 he intended to offer testimony of "a number of medical personnel" who "would all testify to
3 things that Mary said while she was in on psychiatric hold" including "comments about her
4 anger toward [petitioner]." Despite finding that all these rulings were in error, the state Court of
5 Appeal held that the evidence was cumulative and any error was harmless (*id.* at 40–42).

6 Again, the state Court of Appeal's decision to label the evidence as cumulative does not
7 make its ultimate ruling a reasonable application of *Chambers*, *Krulewitch* and *Hawkins*. The
8 evidence petitioner sought to introduce evinced both the victim's belligerent attitude and her
9 desire, shortly before the stabbing, to kill petitioner. The nurse's own notes bore out the defense
10 proffer. Yet, the trial judge excluded it. The excluded evidence was probative of the central
11 issue, state of mind. In addition, the cross-examination would have put the jury in a better
12 position to evaluate the nurse's testimony that had characterized Mary purely as a victim in the
13 relationship.

14 Other evidence of Mary's violent behavior had come into trial. But evidence from a
15 *medical professional* — and a prosecution witness at that — about Mary's comments made so
16 close in time to the incident was not only probative but also highly reliable. Most of the other
17 evidence of Mary's aggression and violence came in through testimony of petitioner and his
18 father. The jury could dismiss those sources as biased. The nurse, however, was not subject to
19 that charge. Again, petitioner was entitled to put on *all* the evidence that might tip the verdict in
20 his favor, not just samplings from all favorable sources.

21 **D.    Evidence of Petitioner's Threats Against A Police Officer.**

22 At trial, the prosecution called Officer Stephen Brauer during its case-in-chief to testify
23 that, when he arrested petitioner five years before the incident, petitioner threatened to kill him
24 (RT 1610–18). The officer testified that petitioner said that he had high-powered rifles and had
25 threatened to shoot Office Brauer's kneecaps off, to blow the heads off any officers who came
26 into his residence and to sit across the street from the police station and pick off police personnel
27 as they left. The state Court of Appeal found that this five-year-old incident was inadmissable
28

character evidence but that, in light of other evidence of petitioner's character for threatening violence, the error was harmless (*Parle*, No. H017348, slip op. at 53, 55).

Admitting this character evidence was especially harmful in light of the fact that the trial court excluded so much evidence of Mary's violent character. The images created were of a man with sustained violent tendencies — contrary to the defense of an impulsive, manic episode — and of a woman with more subdued aggressions. A main issue for the jury was the balance of aggression between the two leading up to the fatal argument. By admitting the police officer's testimony that petitioner threatened to kill him five years before the homicide, yet excluding testimony that Mary threatened to kill the petitioner *days* before the homicide, the trial court unfairly stacked the evidence against petitioner. Furthermore, testimony by a police officer about petitioner's violence may have been seen as more credible, by the jury, than testimony by biased witnesses such as Mary's son from a prior marriage and one of her friends.

### E. Cumulative Impact.

Here, we have not one but five serious errors. These errors were all conceded by the state appeals court. Had these errors not occurred, there is a reasonable prospect that the outcome would have been different. Petitioner's psychotherapist-patient privilege was violated. The prosecution turned petitioner's own doctor against him. When the defense tried to mitigate the damage, the proffer through a different medical expert was wrongly rebuffed. All this went to petitioner's state of mind. These errors were compounded by the exclusion of testimony of petitioner's father, one of the few people with him immediately after the homicide, which would have supported petitioner's defense that he did not deliberate before killing Mary and thus did not have the intent requisite for first-degree murder. A nurse (presented by the prosecution) would have testified to Mary's vindictiveness and wish to kill petitioner shortly before the incident. But the trial judge wrongly barred all that testimony. Petitioner was further portrayed as a habitual premeditator through a threat made to the police officer five years before the incident.

All of these errors exacerbated each other for they all went to the core of the defense and the comparative balance of hostility between the two combatants. Finally, all of these errors

18

1 further undermined petitioner's credibility in a trial where he took the witness stand and was one
2 of only two living witnesses to the stabbing.  In short, the prosecution fully told its story, even to
3 the point of improper prejudice and violation of a privilege.  The defense, however, was not
4 heard in full.

5       The state Court of Appeal's judgment that these errors did not collectively violate due
6 process was an unreasonable application of *Chambers*, *Krulewitch* and *Hawkins*.  It was so partly
7 because the errors here were at least as damaging to the accused on the central issue at trial as
8 were the errors in *Chambers*.  It was unreasonable for the state court to affirm the conviction,
9 given that it was scarred by the same grade and type of cumulative error that required reversal in
10 *Chambers*.  Furthermore, the state Court of Appeals decision was an unreasonable application of
11 *Krulewitch* and *Hawkins* because it based its conclusion of harmless error on the supposedly
12 cumulative nature of the evidence.  The mere fact that the evidence was cumulative (a finding
13 with which this Court disagrees) did not give the state court a free pass to disregard the
14 potentially harmful collective effect of the errors.

15       Given that the decisive issue before the jury was the state of mind of petitioner, the
16 errors, in the aggregate, so "infected the trial with unfairness as to make the resulting conviction
17 a denial of due process," *DeChristoforo*, 416 U.S. at 643.  Put another way, these errors
18 cumulatively had a "substantial and injurious effect or influence" on the jury's verdict, *Brecht*,
19 507 U.S. at 637.  At the very least, one is left in grave doubt about whether these errors
20 collectively had substantial influence over the jury's verdict.  *See O'Neal*, 513 U.S. at 434–35.
21 Relief must be granted.  The contrary result reached by the state Court of Appeal was an
22 unreasonable application of well-established principles of due-process law expressed in
23 *Chambers*, *Krulewitch* and *Hawkins*.

## CONCLUSION

25       The erroneous evidentiary rulings by the state court infected the trial with such unfairness
26 that it rose to the level of a due-process violation.  Cumulatively, the impact of these errors is
27 devastating to one's confidence in the reliability of the verdict.  The state Court of Appeal's
28 decision to the contrary was an unreasonable application of *Chambers*, *Krulewitch* and *Hawkins*.

For the reasons stated, the petition for a writ of habeas corpus is **GRANTED**. Petitioner must be released and his conviction **VACATED** unless the state timely re-tries him. The effectiveness of this writ shall be stayed until ninety days after all appellate proceedings become final. The writ shall become void, however, if the State of California re-tries petitioner before this ninety-day period expires.

**IT IS SO ORDERED.**

Dated: August 31, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE